Filed 2/18/16  In re Hugo N. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re HUGO N., a Person Coming Under the Juvenile Court Law. | B266541 (Los Angeles County Super. Ct. No. CK91061) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ALBERTO L.,<br><br>Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Daniel Zeke Zeidler, Judge.  Affirmed.

Michelle L. Jarvis, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Alberto L. (father) appeals the order of the juvenile court terminating his parental rights to his son Hugo N. (Hugo). We affirm.

On December 13, 2011, the Department of Children and Family Services (DCFS) filed a petition alleging under Welfare and Institutions Code[1] section 300, subdivision (b) that father failed to protect his children then 12-years-old O.N. (O.N.) and then seven-years-old Hugo as a result of father's nine-year history of alcohol abuse. (We do not discuss the other unrelated allegations, which the court later dismissed.) Father was under the influence on October 2, 2011 when the children were in his care and supervision, and he had two criminal convictions for driving under the influence (DUI). DCFS had received a referral that law enforcement reported to the home and found father "'had been drinking [a] severe amount of alcohol'" and was fighting with his landlord and his landlord's friend. The police arrested father and the children went to stay with a family friend. Mother had died in 2006.

O.N. told DCFS she did not like father's drinking, and was sometimes afraid when he drank. Neither child reported any abuse or neglect. Father's former roommate stated that father had a drinking problem.

Father, who was still in custody and was not present, was appointed counsel at the December 13, 2011 detention hearing. The court found father's plan for placement with the family friend appropriate, and ordered the children released to him when he was no longer in custody on the condition that he test weekly and on demand, and attend Alcoholic Anonymous (AA) meetings. Father was released from custody on the day of the hearing, and the children were released to him the next day. On December 15, 2011, he enrolled in random alcohol and drug testing.

In the January 23, 2012 jurisdiction/disposition report, O.N. stated that father had a drinking problem, mostly on the weekends. After mother died in 2006 the family lived with father and his girlfriend, who left a year earlier because of father's drinking. Hugo denied he ever saw father drink and get drunk.

---

[1] All further statutory references are to the Welfare and Institutions Code.

2

Father admitted his alcohol problem began after mother died. He would drink beer on the weekend and at times got heavily intoxicated. He was drinking before the fight on October 2, 2011, served seven days in jail after his arrest, and then was taken to the Immigration and Customs Enforcement detention center. Father was released after showing he had lived in the United States more than 10 years, and he was waiting to receive a permanent residency card. Both children said father took good care of them, and Hugo said he wanted to continue to live with father. O.N. was rebellious, twice sneaking out of the home without father's consent. DCFS recommended the children not remain in the home of father and be placed together in foster care (they could not return to the family friend's home because adults living there refused to live-scan). Father had not shown up for four drug tests, had not attended AA regularly and had no sponsor, and his living situation was inconsistent. DCFS recommended weekly monitored visits. After hearing, the trial court detained the children from father on January 23, 2012.

In April 2012, father was attending a substance abuse program and regular AA meetings, and had a sponsor. He also attended individual counseling and parent education and had tested negative without missing any tests. Father stated he was a changed man and wanted the children to return home. On April 11, 2012, the trial court sustained the section 300, subdivision (b) count, dismissed the other counts, and allowed father unmonitored day visits with discretion for overnights.

DCFS reported in May that the unmonitored visits had been going well, and recommended the children be returned to father's home. On May 14, 2012, the court declared O.N. and Hugo dependents and placed them in father's home with family maintenance services while father continued to participate in programs.

On August 24, 2012, a subsequent petition pursuant to section 342 alleged under section 300: under subdivision (a) that father struck O.N. with a belt, injuring her torso, left arm and right leg, placing her and Hugo at risk of harm; under subdivision (b) that father's physical abuse was a failure to protect, and that on the date he hit O.N., father was under the influence of alcohol; and under subdivision (j) that Hugo was at risk as O.N.'s sibling. O.N. had called the social worker to report that father got drunk and hit

3

her with a belt, and then father hid her phone so she could not call until 2:00 p.m. the next day. When the social worker arrived she saw marks on O.N.'s arm and detained both children. Hugo saw nothing but said he had been physically disciplined since returned to father's care. Father told the social worker he was "very tired of [O.N.]" and had been drinking beer when he hit her. He was "only concerned about his son, Hugo, as he is very attached to him and concerned about how he is going to feel." Father had completed his alcohol program and said he did not have time to do another. The children were in foster care. O.N. said she did not want to visit father or go home, but Hugo wanted to visit and return home. On August 24, 2012, the trial court detained the children into foster care, and ordered testing on demand, anger management counseling, and monitored visitation for father.

The second jurisdiction/disposition report, filed on September 14, 2012, stated father was struggling because he had lost his job and did not have rent money. Although O.N. described father as visibly intoxicated when he hit her five times, father said he only had one beer, he wanted the children back, and his drinking was not a problem. Hugo, who was very hyperactive and struggling in school, wanted to live with father; Hugo stated that a friend who lived with father could take care of Hugo and make sure father did not drink. The court sustained the allegations, declared the children dependents, removed the children from father's home, and ordered family reunification and drug testing and alcohol treatment for father.

On March 12, 2013, DCFS reported that the treatment program terminated father after a month, for poor attendance. He had completed four drug tests and missed three, and visited the children weekly. They liked their caregiver and wanted to stay there. O.N. repeated she did not want to return to father; Hugo did. Hugo was taking medication for hyperactivity.

On September 10, 2013, DCFS reported that two people had seen open beer bottles in father's car, and O.N. had been told that father was still drinking. Father had been arrested on February 1, 2013 for rape and disorderly conduct while under the influence. He was arrested again for DUI on August 22, 2013.

4

Hugo stated he wanted to stay in the foster home until O.N. went home to father, and then he would like to go back as well. O.N. was struggling in the foster home and would rather be with her father, but was also open to adoption. Hugo was very confused, wanting to reunify with father but also wanting to be adopted. "His biggest fear is not being able to continue to see his birth father if he is adopted."

In January 2014, O.N. stated she did not want to be adopted and wanted to stay in foster care. Hugo's "'number one choice'" was to return to father soon, or to remain placed with O.N. A mental health assessment of Hugo diagnosed attention deficit hyperactivity disorder, posttraumatic stress disorder, and oppositional defiant disorder, resulting from his exposure to neglect, parental substance abuse, physical violence, and an unstable environment in infancy and early childhood.

DCFS reported at an April 11, 2014 hearing that father was attending his court-ordered program, wanted the children back, and had missed one drug test. The court terminated family reunification services and ordered DCFS to initiate an adoptive home study on the caregiver, giving father unmonitored visits in public.

On July 28, 2014, the foster mother reported that O.N., who had been suspended for fighting and staying out at night, was verbally and physically aggressive towards Hugo. DCFS moved O.N. to another foster home. Both O.N. and Hugo were open to meeting an adoptive family to "'see what happens,'" but Hugo remained hopeful he would return to father. Father wanted the children returned to him.

In November 2014, Hugo's foster parents stated they wanted to adopt Hugo, who was willing to be adopted only by his foster parents. The home study was canceled as the foster father had a criminal history. Father visited less regularly, and often canceled visitation appointments; Hugo said, "'the first time I got sad, but now I'm used to it.'"

DCFS reported that father had been arrested on November 8, 2014 for fighting, was charged with battery with serious bodily injury, convicted of a misdemeanor, and sentenced to 20 days in jail and three years' probation. Father said he only had two beers and the man had offended him and his girlfriend. O.N. was living at a maternity home and was a chronic runaway.

On January 30, 2015, Hugo was placed in a "fost/adopt" home with Ms. B, who had an approved adoption home study and wanted to adopt Hugo. Hugo was happy living with Ms. B and did not want to go back to his former foster home, but still "wishe[d] to reunify with his birth father if possible," although if not, he would be happy to stay with Ms. B.

In May 2015, when father learned Hugo might be adopted, he said he wasn't drinking and pleaded with the social worker to change the recommendation, to give him hope. At a weekly visit in July, father gave Hugo a birthday party. Ms. B saw father pour beer into a plastic cup, at first hiding it until his intoxication increased, then getting sloppy and spilling beer over a table. Hugo cried and said, "'You promised you wouldn't drink on my birthday!'" Ms. B took Hugo home. When the social worker called father to say future visits would now be monitored, he said he understood. He canceled his next two visits.

O.N. gave birth, and she and her baby had a strong connection with her boyfriend's parents. O.N. did not want to be adopted, but she was attached to Ms. B and spent time in her home with Hugo. Hugo stated if he could not return to his father, he would be happy to be adopted by Ms. B.

At a section 366.26 hearing on July 27, 2015, children's counsel informed the court that Ms. B was interested in having O.N. placed with her and Hugo, and the court ordered DCFS to look into it. The court ordered O.N. into long-term foster care until emancipation at age 18. The recommendation for Hugo was termination of parental rights, and the court set a contested hearing.

On August 10, 2015, father filed a section 388 petition asking that Hugo be returned to his custody, with family maintenance services. He admitted an error in judgment, and stated he had completed all his classes (which had made him a better father), was attending AA meetings, and was gainfully employed. "[M]y children only have me. Please give me another chance to be a father." Hugo had said that he did not want to be adopted. "He only wants to be returned to me. My son stresses when he has

to return to his foster home." The court denied the petition for lack of sufficient new evidence or changed circumstances, and as not in Hugo's best interests.

At the contested section 366.26 hearing on August 11, 2015, father testified that he visited Hugo on the weekends for around four hours and they had a lot of fun, monitored by the foster mother. Hugo never wanted to leave after the visits. There had been beer at Hugo's birthday party, and father was pouring some into a cup for his brother-in-law. Father was not drinking, did not get drunk, and Hugo did not say anything to father about the beer. Hugo did not want adoption; he just wanted to be with his father. Father knew he had made a mistake in hitting O.N. and took responsibility, but Hugo was all he had. They were best friends, talking three times a week on the phone and texting.

Hugo, then 11, testified that he knew what adoption was ("I live with someone else until I'm 18," and they would be your parent). If he couldn't return to father, he wanted to be adopted if he could see his father. If adoption meant he didn't see his father any more, he would be sad, and would not want to be adopted. They loved each other.

Hugo's counsel argued that father still did not take responsibility three years and seven months into the case, and seemed to want to blame everyone but himself for his drinking. Although Father had a great bond with Hugo, Hugo's need for permanence outweighed the detriment caused by terminating parental rights. Hugo's desire to continue to visit his father did not create an exception to adoption.

The court asked Ms. B if she would be willing to be a legal guardian, and she stated she wanted to adopt a child. Father's counsel asked the court to find a "significant bond" between father and Hugo so that adoption would not be in his best interests, and recommended a permanent plan of legal guardianship. The court observed that Hugo had been in the system for more than three years.

Counsel for DCFS represented that Ms. B was willing to sign an agreement to allow father to visit after the adoption. Father continued to relapse, canceled numerous visits before and after the birthday party, and had another criminal case. Counsel requested that the court terminate parental rights and "consider a kinship agreement so that father can continue to have visits with the child."

7

The court concluded that father had been afforded plenty of time to work to regain custody and show changed circumstance. In December, Hugo would have been in the system for four years. DCFS had searched for an adoptive home for over a year. Father had a parental role, Hugo loved him, and wanted to continue to see him. Nevertheless, father's backsliding and failure to take responsibility for his "ongoing and repetitive alcohol abuse" showed that the benefit of permanence and adoption outweighed "the level of that parental role and relationship." If he were not adopted, Hugo would bounce from placement to placement for the next seven years. Hugo "wants to be adopted. He would prefer to have ongoing contact with his father."

The court terminated parental rights and transferred custody to DCFS for adoption planning and placement, adding that Ms. B had discretion to permit ongoing contact with father.

Father filed a timely notice of appeal from the order terminating parental rights.

**DISCUSSION**

Section 366.26, subdivision (c)(1)(B) requires the juvenile court to terminate parental rights and order the dependent child placed for adoption if it finds by clear and convincing evidence that the child is likely to be adopted, unless it finds "a compelling reason for determining that termination would be detrimental to the child" due to the existence of specified exceptional circumstances. "[A]doption is the Legislature's first choice for a permanent plan for a dependent minor child who has not been returned to the custody of his or her parents and who is found by the dependency court to be adoptable." (*In re Scott B*. (2010) 188 Cal.App.4th 452, 469.) Section 366.26, subdivision (c)(1)(B)(i), provides an exception where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." The burden is on the parent to demonstrate regular visitation, and that termination of parental rights to an adoptable child would be detrimental to the child. (*In re C.F*. (2011) 193 Cal.App.4th 549, 553; *In re T.S*. (2009) 175 Cal.App.4th 1031, 1039.)

8

We review the juvenile court's section 366.26 findings for substantial evidence.[2] (*In re C.F.*, at p. 553; *In re S.B.* (2008) 164 Cal.App.4th 289, 297–298.)

A parent's failure to maintain regular visitation and contact precludes a finding that the exception exists. (§ 366.26, subd., (c)(1)(B)(i); *In re C.F.*, *supra*, 193 Cal.App.4th at p. 554.) Even if a parent has maintained regular visitation and contact, the exception does not apply unless the strength and quality of the natural parent/child relationship outweighs the security and the sense of belonging a new family would confer. (*In re C.F.*, at p. 555.) "A parent must show more than frequent and loving contact or pleasant visits." (*Id*. at p. 555.) Only if "severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed" is the preference for adoption overcome. (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 575.)

Here, the court did not find that father failed to visit with Hugo regularly. Even in the absence of that finding, substantial evidence supports a conclusion that the strength and quality of father's relationship with Hugo did not outweigh the security and sense of belonging in a new family with Ms. B.

Father and Hugo had a loving relationship. Over Hugo's various placements during the nearly four years of the dependency proceedings, Hugo consistently stated he wanted to be adopted but also wanted to continue to see father. Although father also expressed his love for Hugo, "[n]o matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life.'" (*In re K.P.*, *supra*, 203 Cal.App.4th at p. 621.) *"Moreover, '[b]ecause a section 366.26 hearing occurs only*

[2] Courts have applied different standards of review, reviewing whether a beneficial parental relationship exists for substantial evidence and whether there is a compelling reason to apply the exception for abuse of discretion (*In re K.P.* (2012) 203 Cal.App.4th 614, 621–622); reviewing for abuse of discretion while reviewing purely factual findings for substantial evidence (*In re C.B.* (2010) 190 Cal.App.4th 102, 122–123); and reviewing for abuse of discretion. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.) On the record before us, we would affirm under any of these standards.

*after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.'"* (*Ibid*., italics added.) The court acknowledged that father had a parental role and Hugo wanted to maintain contact, but concluded that father had shown an inability to address the alcohol abuse that caused Hugo's removal when he was seven. There was no evidence that keeping Hugo in foster care, likely in numerous placements, outweighed the permanence and stability provided by adoption by Ms. B.

Father points out there is no guarantee that Ms. B would continue to allow him to visit Hugo, citing *In re C.B.*, *supra*, 190 Cal.App.4th 102 to argue that the court should have preserved his parental rights to ensure that he would see Hugo in the future. That case, however, held that *when a juvenile court determines that the parent-child exception is established,* it "cannot nevertheless terminate parental rights based upon an unenforceable expectation that prospective adoptive parents will voluntarily permit future contact between the child and a biological parent, even if substantial evidence supports that expectation." (*Id*. at p. 128.) The trial court here did not determine that the parent-child exception was established and then conclude that it would terminate parental rights nevertheless, based upon the expectation that Ms. B would allow father to see Hugo so that Hugo "'will have the best of both worlds.'" (*Id.* at p. 127.) Instead, the court reached its decision that the exception did not apply without assuming that Ms. B would allow continued contact with father. The court's subsequent grant of discretion to Ms. B to permit continuing contact was an acknowledgment that there was no guarantee that Ms. B would do so.

Father failed to establish that Hugo would be "greatly harmed" by the termination of the parent-child relationship (*In re Autumn H*., *supra*, 27 Cal.App.4th at p. 575), and substantial evidence supported the trial court's order.

10

**DISPOSITION**

The order terminating parental rights is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


CHANEY, Acting P. J.


LUI, J.

11